01

02

03

04

05
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
06
AT SEATTLE

07 DAVID RICHARD ISRAEL,     )   CASE NO.: C05-1714-TSZ
                     )
08      Petitioner,     )
                     )
09      v.     )   REPORT AND RECOMMENDATION
                     )
10 KENNETH QUINN,     )
                     )
11      Respondent.     )
_____ )

12

13 <u>INTRODUCTION AND SUMMARY CONCLUSION</u>

14      Petitioner is currently in the custody of the Washington Department of Corrections

15 pursuant to his King County Superior Court convictions for first degree robbery, conspiracy to

16 commit robbery, and money laundering.  He has filed a petition for writ of habeas corpus under

17 28 U.S.C. § 2254 seeking relief from those convictions.  Respondent has filed an answer to the

18 petition as well as relevant portions of the state court record[1].  Petitioner has filed a traverse to

19 respondent's answer.  The briefing is now complete, and this matter is ripe for review.  This Court,

20

_____

21      [1] Respondent has been directed on two occasions to supplement the record with additional
portions of the trial transcript which were not included in respondent's initial submission of the
22 state court record.

REPORT AND RECOMMENDATION
PAGE -1

01 having reviewed the petition, the briefs of the parties, and the state court record, concludes that

02 petitioner's federal habeas petition should be denied and this action should be dismissed with

03 prejudice.

04 <u>PROCEDURAL HISTORY</u>

05 On December 2, 1996, petitioner David Israel, William King, Vincent Bryant, and Jeffrey

06 Dorman were charged in King County Superior Court with a total of 41 counts arising out of eight

07 home-invasion robberies that were committed between October 15, 1993, and March 3, 1994.

08 *See State v. Israel*, 113 Wn. App. 243, 254 (2002). Petitioner and King were tried together in

09 early 1999 on one count of conspiracy to commit robbery in the first degree, two counts

10 robbery in the first degree, and two counts of kidnaping in the first degree.[2] *Id*. Petitioner was

11 also tried on one count of money laundering. *Id*. At trial, the prosecution alleged that King,

12 Bryant, and Dorman participated in the robberies, and that petitioner disposed of the proceeds

13 through his pawnshop. *Id*. at 252-254. Dorman pleaded guilty to a charge of conspiracy to

14 commit robbery and agreed to testify for the prosecution at the joint trial of petitioner and King.

15 *Id*. at 254. Bryant did not testify at the trial.*Id*. Petitioner was convicted by a jury on all counts.

16 *Id*.

17 Following his trial, petitioner filed a motion for a new trial based on newly discovered

18 evidence. ( *See* Dkt. No. 14, Ex. 3.) The trial court denied petitioner's motion as to the

19 conspiracy to commit robbery and money laundering charges, but granted the motion as to the

20 robbery and kidnaping charges. (*Id*.) On September 3, 1999, petitioner was sentenced to 36

21

22 [2] King was tried separately from petitioner in 1997 for his role in one of the eight home-invasion robberies.

01 months confinement on the conspiracy charge and 12 months confinement on the money

02 laundering charge. (*Id.*, Ex. 2.) The sentencing court ordered that these sentences be served

03 concurrently. (*Id.*)

04        The State appealed the trial court's order granting the new trial and the trial court's failure

05 to order petitioner to pay restitution to two of the victims. (*Id.*, Ex. 5.) Petitioner filed a cross-

06 appeal in which he challenged the trial court's order denying the new trial as to the conspiracy and

07 money laundering counts, as well as other alleged trial errors.[3] (*Id.*, Ex. 6.)

08        On September 2, 2002, the Washington Court of Appeals affirmed petitioner's convictions

09 for money laundering and conspiracy to commit robbery in the first degree, but reversed his

10 convictions for first degree robbery and kidnaping. *Israel*, 113 Wn. App. at 301. The Court of

11 Appeals remanded for a new trial on the first degree robbery charges, but remanded for dismissal

12 of the first degree kidnaping convictions on the grounds that the evidence was insufficient to

13 support petitioner's convictions as an accomplice on those charges. *Id.* The Court of Appeals

14 also remanded petitioner's sentence for an award of additional restitution to two of the victims.

15 *Id.*

16        Petitioner thereafter moved for reconsideration of the Court of Appeals decision to the

17 extent that it affirmed his convictions for conspiracy to commit robbery and for money laundering.

18 (Dkt. No. 14, Ex. 11.) Petitioner also asked the Court of Appeals to reconsider its resolution of

19 the restitution issue. (*Id.*) The Court of Appeals denied petitioner's motion for reconsideration

20 on October 4, 2002. (*Id.*, Ex. 12.) Petitioner next filed a petition for review in the Washington

21 

22      [3] Petitioner's direct appeal was consolidated with King's direct appeal of both his 1997 and 1999 convictions. *See Israel*, 113 Wn. App. at 252 n.1.

REPORT AND RECOMMENDATION
PAGE -3

01  Supreme Court.  (*Id.*, Ex. 13.)  The Supreme Court denied review without comment on May 28,

02  2003.  *See State v. Israel*,  149 Wn.2d 1013 (2003) (Table).[4]

03       On July 29, 2003, following remand to the King County Superior Court, petitioner entered

04  guilty pleas to the two robbery charges pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970).

05  (*See id.*, Ex. 32.)  On the same date, the court sentenced petitioner to 70 months confinement on

06  each of the robbery charges, those sentences to be served concurrent to each other and to the

07  sentences imposed on the conspiracy and money laundering charges.  (Dkt. No. 14, Ex. 1.)

08       In early 2004, petitioner filed a pro se motion for relief from judgment in the King County

09  Superior Court.  (*Id.*, Ex. 17.)  That motion was transferred to the Court of Appeals for review

10  as a personal restraint petition.  (*Id.*, Ex. 19.)  On June 21, 2004, petitioner, through counsel, filed

11  a personal restraint petition directly with the Court of Appeals.  (*Id.*, Ex. 20.)  Petitioner's two

12  personal restraint petitions were consolidated for argument and, in February 2005, the Court of

13  Appeals issued an order dismissing the petitions.  (*Id.*, Exs. 25 and 26.)

14       Petitioner thereafter filed a motion for discretionary review in the Washington Supreme

15  Court.  (*Id.*, Ex. 27.)  On May 16, 2005, the Supreme Court Commissioner issued a ruling denying

16  review.  (*Id.*, Ex. 28.)  Petitioner's subsequent motion to modify the Commissioner's ruling was

17  denied.  ( *See id.*, Exs. 29 and 30.)  The Court of Appeals issued a certificate of finality in

18  petitioner's personal restraint proceedings on October 21, 2005.  (*Id.*, Ex. 31.)  Petitioner now

19  seeks federal habeas review of his convictions.

20

21       [4] The Court notes that a substantial portion of Exhibit 14 and the entirety of Exhibit 15,
which it appears is probably the Washington Supreme Court's Order denying review, are missing
from the record provided by respondent.  However, neither of those omissions affect this Court's

22  ability to resolve the issues before it.

REPORT AND RECOMMENDATION
PAGE -4

FACTS

The Washington Court of Appeals summarized some of the testimony presented at the 1999 joint trial of petitioner and William King[5]:

### 1. Dorman and Bryant Prior Statements to Investigators

While police were investigating the robberies, both Dorman and Bryant offered to disclose the identity of their "fence" in exchange for leniency. According to one detective's testimony, Dorman made reference to a person who he would not name, but referred to as "dude." Dorman said "dude" would order the robberies, and then he and the others would bring the merchandise back to "dude." When detectives pressed Dorman for a name, he said only that the person lived on Mercer Island and had not been in trouble with the law before. According to another detective, Bryant also sought out police when he learned he was under investigation and offered to tell them "who the fence was, who the guy was that had been sending him and his cohorts to these various places." Bryant referred to this person as "a rich, white guy on Mercer Island." Dorman eventually pleaded guilty to one count of conspiracy to commit robbery, and the State agreed to dismiss the other charges against him. Dorman had already pleaded guilty to two robberies committed in Bothell in February 1994. Bryant supplied prosecutors with information on the seven robberies after entering into a use immunity agreement, but did not participate in either trial at issue in this appeal. *See State v. Bryant*, 97 Wash.App. 479, 481, 983 P.2d 1181 (1999). Dorman testified for the State in the trial of Israel and King.

### 2. Dorman's Testimony

Dorman testified that he participated in seven of the eight home-invasion robberies with Bryant. Of those seven robberies, he testified that King was a driver or lookout in two. He also testified that King and Bryant robbed another home by themselves and told Dorman about it later. Dorman further testified that he and Bryant sold most of the jewelry from the robberies to Israel, the owner of a pawn shop in Lynnwood.

The first robbery to which Dorman testified occurred in Longview on October 23, 1993. Dorman, Bryant, and King drove to a house that Bryant had selected previously. King stayed in the car while Dorman and Bryant robbed the family inside.

---

[5] While the Court of Appeals' summary is lengthy, it provides an overview of relevant testimony in an organized fashion, and is therefore useful in understanding the context in which petitioner's federal habeas claims arise.

After the Longview robbery, Dorman testified that he and Bryant went to a bar in Lynnwood, where Israel paid cash for the jewelry.  Dorman did not talk to Israel or hear what he and Bryant said to each other at that meeting.

Dorman testified that on November 5, 1993, he, Bryant, and King robbed a house in Everett.  King was the "lookout," while Dorman and Bryant tackled a man coming out of the house, took him back inside, and subdued the family.  They ransacked the house and took a number of items including jewelry.

Dorman testified that he first met Israel after the Everett robbery, when he and Bryant went to Israel's pawn shop and sold him the jewelry taken in that robbery.  They went to Israel's Pawn-X-Change (hereafter "PXC") store in Lynnwood.  He and Bryant negotiated a price for the jewelry in Israel's office in the back of the shop.  According to Dorman, Israel told him that the others working at the store "had nothing to do with it, and were not to have anything to do with it."

Dorman left for California shortly after the Everett robbery.  While Dorman was gone, Jerry and Angelina Burtenshaw were robbed in their Mercer Island home.  Dorman returned in December.  Dorman testified that shortly after he returned, he, Bryant, and King got together.  Bryant told Dorman that he and King had robbed a house while Dorman was gone and that it was a "good score and ... a lot of cash, jewelry.  They'd gotten a good tip from Israel and it paid off."  Dorman testified, over objection, that this information was "significant" to him because it meant "we were moving in that direction" of "[g]etting better scores, more information about robberies, or actually more profitable robberies."  Dorman also testified that this information interested him because he and Bryant had been trying to get Israel to give them tips on more lucrative jobs.

Dorman testified that he and Bryant (without King) proceeded over the next month to commit four more robberies in Woodinville, Normandy Park, Shoreline, and Federal Way.  Dorman's testimony did not indicate that Israel was responsible for directing them to any of these homes. . . .

### 3. Israel's Testimony

Israel testified in his own defense.  He denied that he was a participant in the conspiracy and denied knowingly receiving stolen property.  According to Israel's testimony, he first met Bryant through a business partner with whom Israel operated a jewelry store.  Israel said he ran into Bryant in 1993 at a gun club, and Bryant asked if Israel was still in the jewelry business.  Israel told Bryant about his new shop, the PXC in Lynnwood.  Israel said he thought of Bryant as a "pocket vendor," a term he used for people who made their living "on the margins" by selling jewelry or other items out of their cars.

REPORT AND RECOMMENDATION
PAGE -6

On October 23, 1993, Bryant came to the pawn shop and sold Israel some broken chains and diamonds. Israel paid Bryant $4,000. Israel said his business partner, Brad Shain, was present and participated in negotiating a price for the jewelry with Bryant. According to Israel, Bryant did not tell them any of the items were stolen. Israel said Bryant came back in November with more diamonds and "scrap" jewelry. According to Israel, "scrap" jewelry was broken or loose jewelry that the PXC would sell wholesalers to be melted down or used in new jewelry. Israel testified that Shain was also present and negotiated with Israel at this second transaction and again claimed that neither of them knew the items were stolen. Shain testified and claimed he never engaged in those negotiations and that although he remembered Bryant, he never dealt with him directly.

On November 30, the Israels attended a memorial service for Israel's father. After the service, they went to his parents' home. Israel's mother told Israel and the others there that Mrs. Burtenshaw had called to express her condolences. Someone asked who the Burtenshaws were, and Israel's mother explained that they were family friends. She then went on to say that they were very wealthy, had built a new home on the water, and that Mrs. Burtenshaw dressed well, drove nice cars, and wore a diamond the size of her knuckle. Israel's wife testified that she heard this conversation.

The next day, on December 1, 1993, Israel testified that he went to work at the PXC. He found a message to call Bryant, who had been in the store in late November trying to sell Israel some sports cards. Israel called Bryant and told him he was interested in buying the cards. Israel testified that at some point, he struck up a conversation with Shain about the Burtenshaws and told Shain everything his mother had said the day before, including the part about the knuckle-sized diamond. By the time Israel finished the conversation, he said Bryant was standing there with the box of sports cards. Israel bought the sports cards and Bryant left. Brad Shain testified that he did not remember any of these events.

The next day, December 2, 1993, was the date the Burtenshaws were robbed in their home on Mercer Island. The day after that, Israel testified that Bryant showed up at the PXC with a small black bag full of "mangled jewelry." Israel testified that the jewelry was thrown into the bag in an unorganized fashion. Israel asked where the jewelry came from. Bryant said it did not matter, and wanted $100,000 for it. Israel refused to buy it. Bryant became agitated and demanded that Israel buy it. Israel left his office and got Brad Shain, and they both told Bryant to leave the store.

According to Israel, Bryant then became angrier and began to threaten them. Bryant told Israel that it was his fault "these people got robbed." He said, "[Y]ou're gonna buy this ... or I'm gonna tag you with it." He threatened to kill them unless they did what he wanted. He asked if they were going to call the police, and they said

no.  After repeatedly telling Bryant to leave the store, Bryant left, saying he would be back.  Shain denied that he was present during this exchange, although he testified that he had seen Bryant in the store several times and had heard Israel and Bryant arguing loudly on one occasion.

Israel testified that he went home and told his wife what had happened.  She suggested that he call the police, but Israel said he was afraid Bryant would kill them if he did.  Israel said his wife's brother had once mentioned a good criminal defense attorney, David Chesnoff, who lived in Las Vegas.  The next day, Israel got Chesnoff's number and called to ask for advice.  Chesnoff told Israel not to go to the police, not to take any jewelry from Bryant, and not to give him any money.  Israel told his wife the advice, and she told him again that he should go to the police and suggested that perhaps he should buy the jewelry back and bring it to the Burtenshaws and go to the police with them.  Israel called Chesnoff again and told him this idea.  Chesnoff said Israel's wife was a "lunatic."  Chesnoff and Israel's wife testified and corroborated these conversations.

Israel testified that Bryant visited the pawn shop again on the same day Israel spoke to Chesnoff.  He offered to leave them alone in exchange for some money.  Israel testified that he and Shain refused, and Bryant left.  Israel called Chesnoff again and told him what happened.  Chesnoff said he did the right thing.  Shain testified that Israel came to him and told him he was being extorted, but Shain denied that he was ever threatened or that he was present when Bryant extorted money from Israel.

Israel testified that Bryant kept coming back to the store and threatening him and Shain and their families.  Eventually, Israel and Shain decided to pay Bryant in exchange for Bryant's promise to leave them alone.  According to Israel, he and Shain cashed a series of checks and paid Bryant $8,000 on December 6, and another $4,000 on December 24.  In addition, Israel said Shain paid Bryant another $2,000 in cash in May 1994.  Shain denied that he ever gave Bryant money.

Israel said that in October 1994, he saw Bryant for the last time.  Bryant demanded more money.  Israel told Bryant he had "had it" and would not give Bryant any more money.  Bryant's demeanor changed.  He apologized and told Israel he never would have hurt him.  Bryant said his wife was pregnant and again asked for money.  Israel refused, and Bryant left.

Israel also testified that he had met Dorman, but knew him as "Corey Baker."  He met Dorman in November 1993 when he came into the pawn shop and introduced himself as a jewelry vendor and a friend of Bryant's.  Israel testified that he and Dorman discussed prices in general and then he sold Dorman four rings.  Thereafter, Israel said he bought jewelry from Dorman on two occasions-in late December 1993 and in late January 1994.  In particular, he testified that he bought an item that was

described in the computer as a "lavender jade diamond ring." The State introduced evidence that a similar ring was stolen during a Normandy Park robbery on December 28, 1993. Israel said he had no idea that Dorman was selling stolen items or that he was involved in robberies.

### 4. Burtenshaw Testimony

Jerry and Angelina Burtenshaw testified that they had been neighbors of the Israel family on Mercer Island. The Burtenshaw children and David Israel were close in age and played together as children. The Burtenshaws attended Israel's wedding.

The Burtenshaws' home at the time of the robbery was on a winding, narrow road. There was a directional sign at a fork in the road nearby, but the Burtenshaws were not listed on the sign. They described their house as difficult to find. The jury was shown a videotape of the area where the Burtenshaws lived.

On December 2, 1993, Jerry Burtenshaw had just come home from shopping when he was attacked in his driveway. Two men forced Burtenshaw into his house, where he and his wife Angelina were held at gunpoint. One of the men asked "where is the safe." Mrs. Burtenshaw led one of the men to the safe while the other watched Mr. Burtenshaw. After the robbery, the men tied both their hands and locked them in the trunk of their car.

### 5. Telephone Records

Telephone records showed a number of calls between the PXC and Dorman, Bryant, and King. The evidence also showed that a number of those calls coincided with the dates of the robberies. The day before the Burtenshaw robbery, someone at the PXC paged Vincent Bryant. The State's theory at trial was that Israel called Bryant to give him directions to the Burtenshaw house. One call was made from King's home to the Burtenshaw home at 2:45 p.m. on the day of the robbery, shortly before the robbery occurred. The day after the Burtenshaw robbery, a call was made form the PXC to Bryant's mother's house.

### 6. PXC Transactions

The State introduced testimony from a police computer forensics expert who analyzed the point-of-sale computer records of the PXC. He explained the laws governing pawn shops, including the requirements that pawnbrokers examine two pieces of government-issued identification and record the names of people selling items. The forensics expert testified that there was a high correlation between the descriptions of items stolen from the Normandy Park robbery that occurred on December 28, 1993, and those recorded as being bought by PXC on January 5, 1994.

REPORT AND RECOMMENDATION
PAGE -9

01     The expert testified that it would be easy to hide stolen property by entering an item
into the computer database as an inventory item rather than as pawn or a purchase,
02     or by deleting or transferring the item in the database, or by not recording the name
of the person or vendor from whom the item was purchased or to whom the item was
03     sold.

04         The State introduced PXC transaction records that showed large cash
transactions without indicating the name of the vendor.  In addition, the dates of
05     relatively large cash transactions from the PXC coincided with the dates of the
robberies.  A PXC store manager testified that it was company policy to enter every
06     item into the computer and that Israel valued the jewelry that came into the store for
pricing purposes.

07

08   *Israel*, 113 Wn. App. at 257-264.

09                        <u>GROUNDS FOR RELIEF</u>

10     Petitioner asserts the following four grounds for relief in his federal habeas petition:

11     1.     Admission of Bryant's Statements to Dorman Violated Israel's Right to
Confront the Witnesses Against Him.

12

13     2.     The Evidence Was Insufficient to Support a Conviction for Conspiracy to
Commit Robbery Because There Was No Evidence That Israel Agreed or
Intended that Dorman, Bryant, or King Should Take Property by Force or
14     Threatened Use of Force.

15     3.     The Prosecutor's Argument That Israel Was Liable For The Crimes of His
Conspirators Which They Committed Before Israel Joined Them Was
16     Misconduct Which Impermissibly Reduced the State's Burden of Proof in
Violation of the Due Process Clause.

17

18     4.     Defense Counsel's Failure to Object to the Prosecutor's Argument that
Coconspirators Are Retroactively Liable for the Prior Crimes of Their
Conspirators Constituted Ineffective Assistance of Counsel.

19

20   (Dkt. No. 1 at 23, 34, 38 and 41.)

21   */ / /*

22

REPORT AND RECOMMENDATION
PAGE -10

01                                    DISCUSSION

02          Respondent concedes that petitioner has properly exhausted his state court remedies with

03  respect to the claims set forth in his federal habeas petition by fairly presenting each of those

04  claims to the Washington Supreme Court as a federal claim.  Respondent argues, however, that

05  petitioner is not entitled to relief with respect to any of his claims because the state court

06  adjudication of the claims was not contrary to, or an unreasonable application of, clearly

07  established federal law.

08                                  Standard of Review

09          Under the Anti-Terrorism and Effective Death Penalty Act, a habeas corpus petition may

10  be granted with respect to any claim adjudicated on the merits in state court only if the state

11  court's decision was *contrary to*, or involved an *unreasonable application* of, clearly established

12  federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable

13  determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d) (emphasis

14  added).

15          Under the "contrary to" clause, a federal habeas court may grant the writ only if the state

16  court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law,

17  or if the state court decides a case differently than the Supreme Court has on a set of materially

18  indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362 (2000).  Under the "unreasonable

19  application" clause, a federal habeas court may grant the writ only if the state court identifies the

20  correct governing legal principle from the Supreme Court's decisions but unreasonably applies that

21  principle to the facts of the prisoner's case.  *Id.*  The Supreme Court has made clear that a state

22  court's decision may be overturned only if the application is "objectively unreasonable."  *Lockyer*

01 *v. Andrade*, 538 U.S. 63, 69 (2003).

02 <u>Ground One: Confrontation Clause</u>

03        Petitioner asserts in his first ground for relief that he was denied his right to confront

04 witnesses against him in violation of the Sixth Amendment to the United States Constitution and

05 the decision of the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004).

06 At issue in this claim are out-of-court statements made by Vincent Bryant to Jeffrey Dorman

07 which incriminated petitioner and King in the December 1993 Burtenshaw robbery, and which

08 Dorman was permitted to testify to at trial.

09        Dorman testified that he had participated in two robberies with Bryant and King in October

10 and November 1993. (*See* Dkt. No. 27-2 at 20-21, Dkt. No. 27-2 at 47-50, and Dkt. No. 27-3

11 at 1-2.) Dorman testified that he left for California shortly after the second robbery. (Dkt. No.

12 27-3 at 7-8.) Dorman returned from California in December 1993. (*Id.* at 9.) Upon his return,

13 he met with Bryant and King. ( *Id.* at 10-11.) Dorman testified that Bryant told him at that

14 meeting about a robbery that Bryant and King had done. (*Id.* at 11.) Dorman also testified that

15 Bryant loaned him a few hundred dollars which Bryant told him he had gotten from the robbery.

16 (*Id.* at 12.)

17        With respect to the robbery itself, Dorman testified, over objection, that Bryant told him

18 "[t]hat they had a good hit; that they'd gotten a good score and gotten a lot of cash, jewelry.

19 They'd gotten a good tip from Israel and it paid off." (*See id.*) Dorman further testified that it

20 was significant to him that petitioner had given Bryant and King a good tip, because it meant they

21 were moving in the direction of "[g]etting better scores, more information about robberies, or

22 actually more profitable robberies." (*Id.* at 13.) According to Dorman, they had been trying to

REPORT AND RECOMMENDATION
PAGE -12

01   get more profitable robberies by trying to get petitioner to provide them with more information

02   on where to go, and they thought petitioner had more information "[b]ecause he was well placed."

03   (*Id*. at 13-14.)  Dorman testified that he and Bryant committed additional robberies after his return

04   from California in December 1993, and prior to his arrest in February 1994.  (*Id*. at 14-40; Dkt.

05   No. 27-4 at 4-6.)

06        Bryant's statements to Dorman implicating petitioner's involvement in the Burtenshaw

07   robbery were the subject of a pre-trial motion *in limine* to exclude any testimony from Dorman

08   regarding those statements.  (*See* Dkt. No. 1 at 30.)  Petitioner argued that the statements

09   constituted inadmissible hearsay under ER 802 and were not admissible under the co-conspirator

10   exception to the hearsay rule.  (*See id*.)  The State, in turn, argued that the statements were

11   admissible under the exception for co-conspirators' statements.  (*See id*.)  The trial court denied

12   petitioner's motion, finding that Bryant's statements to Dorman regarding the Burtenshaw robbery

13   were "made to induce further participation in the conspiracy, to advise Dorman of the health and

14   viability of the conspiracy, and to reassure him of the continued existence of the conspiracy."  *See*

15   *State v Israel*, 113 Wn. App. at 282; *see also* Dkt. No. 14, Ex. 6, Appendix G.

16        The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

17   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

18   him." U.S. Const. Amend. VI.  In   *Ohio v. Roberts*, 448 U.S. 56 (1980), the United States

19   Supreme Court held that the Confrontation Clause does not bar the admission of an out-of-court

20   statement of an unavailable witness so long as the statement bears "adequate indicia of reliability."

21   *Id*. at 66.  Under *Roberts*, an out-of-court statement meets the reliability test if it falls within a

22   "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness.*"  Id*.

REPORT AND RECOMMENDATION
PAGE -13

01  Where evidence falls within a firmly rooted hearsay exception, reliability can be inferred. *Id*. In

02  *Bourjaily v. United States*, 483 U.S. 171 (1987), the Supreme Court made clear that the co-

03  conspirator exception to the hearsay rule is a firmly rooted exception. *Id*. at 183-84.

04         In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court partially abrogated

05  *Roberts*. The Court, in *Crawford*, drew a distinction between testimonial and non-testimonial

06  hearsay, and rejected the *Roberts* test as to testimonial hearsay statements. As to testimonial

07  hearsay statements, the Court held that such statements are barred under the Confrontation Clause

08  unless the declarant is unavailable and the defendant had prior opportunity to cross-examine the

09  declarant. *Crawford*, 541 U.S. at 68-69.

10         The first question this Court must address in evaluating petitioner's Confrontation Clause

11  claim is whether the statements at issue here were "testimonial" and therefore subject to the rule

12  announced in *Crawford*. The Supreme Court did not spell out a comprehensive definition of

13  "testimonial" in *Crawford*, but did note that the term "applies at a minimum to prior testimony at

14  a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*.

15  at 68. The Court also noted that certain statements, such as business records or statements in

16  furtherance of a conspiracy, were not testimonial in nature. *Id*. at 56.

17         On review of petitioner's personal restraint petition, in which petitioner specifically raised

18  the Confrontation Clause issue under *Crawford*, the Washington Supreme Court determined that

19  "the statements Bryant made to Dorman in furtherance of the conspiracy were not remotely

20  testimonial" and therefore were not governed by *Crawford*. (Dkt. No. 14, Ex. 28 at 6-7.) In these

21  proceedings, petitioner concedes that the challenged statement is not testimonial "if the relevant

22  distinction is whether, at the time the statement was made, the declarant has a reasonable

REPORT AND RECOMMENDATION
PAGE -14

01    expectation that the statement will be used in court." (Dkt No. 1 at 27.) Petitioner argues,

02    however, that a different test applies. Petitioner maintains that "[a] test more in accord with the

03    highly prized protection of the right of confrontation is the objective one of whether the pretrial

04    statement of a person other than the defendant, admitted through the testimony of another person,

05    was made spontaneously or in response to interrogation of any sort. If the former, it need not be

06    confronted. If the latter, confrontation applies." ( *Id.*) Petitioner maintains that he sought an

07    evidentiary hearing in state court "to determine whether the statements at issue were spontaneous

08    or in response to questioning similar to interrogation." (*Id.* at 28.)

09          Even assuming the test petitioner suggests is the appropriate one, application of such a test

10    does not help him here. Dorman's testimony regarding when and how the challenged statements

11    were made in no way suggests that the statements were made in response to interrogation of any

12    sort. Moreover, the Court is not satisfied that an evidentiary hearing would illuminate this issue

13    further. In this Court's view, Byrant's statements were not testimonial in nature and therefore are

14    not subject to the rule announced in *Crawford*. Thus, the conclusion of the Washington Supreme

15    Court in petitioner's personal restraint proceedings was entirely reasonable.

16          Because the statements at issue here were non-testimonial, this Court turns to the question

17    of whether the statements were properly admitted under the *Roberts* reliability test which remains

18    applicable to non-testimonial statements. *See Crawford*, 541 U.S. at 68. Under *Roberts*, an out-

19    of-court statement meets the reliability test if it falls within a "firmly rooted hearsay exception" or

20    bears "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.

21          On direct appeal to the Washington Court of Appeals, petitioner argued that Bryant's

22    statements to Dorman were not made in furtherance of the conspiracy, that they therefore

REPORT AND RECOMMENDATION
PAGE -15

01  constituted hearsay and, thus, were improperly admitted at trial.  Petitioner also argued that the

02  admission of the statements violated the Confrontation Clause of the Sixth Amendment.  The

03  Court of Appeals concluded that the trial court properly admitted Bryant's statements under ER

04  801(d)(2)(v) as statements made in furtherance of the conspiracy.  The Court of Appeals also

05  concluded that the challenged statements fell within the firmly rooted co-conspirator exception to

06  the hearsay rule which "automatically establishes their admissibility under the confrontation

07  clause." *Israel*, 113  Wn. App. at 283 (citing *Bourjaily v. United States*, 483 U.S. 171 at 182-83

08  (1987)).

09          In these proceedings, respondent argues that the state courts' resolution of petitioner's

10  Confrontation Clause claim on direct appeal was a reasonable application of clearly established

11  federal law as it existed at the time of adjudication.  Respondent also notes that a large portion of

12  petitioner's argument is that the state court erred when it found the statements fell within the co-

13  conspirator exception, and that it is not the province of a federal habeas court to re-examine state

14  court determinations regarding state law issues.

15          Petitioner, in his traverse, takes issue with respondent's position and argues that in order

16  for this Court to determine whether the state court reasonably applied *Roberts* and *Bourjaily* in

17  his case, this Court must examine whether the state court properly determined that Bryant's

18  statements were made in furtherance of the conspiracy.

19          However, regardless of whether this Court limits its consideration specifically to the Sixth

20  Amendment portion of petitioner's claim, or whether it also reaches the underlying question of

21  whether the challenged statements were, in fact, made in furtherance of the conspiracy and

22  therefore fell within a firmly rooted exception to the hearsay rule, its ultimate conclusion is the

REPORT AND RECOMMENDATION
PAGE -16

01  same.  In this Court's view, the record before it supports the conclusion that the decision of the

02  Washington Court of Appeals, with respect to petitioner's claims regarding the trial court's

03  admission of Vincent Bryant's statements, was objectively reasonable.  Accordingly, petitioner's

04  federal habeas petition should be denied with respect to his first ground for relief.

Ground Two:  Sufficiency of the Evidence

06       Petitioner argues in his second ground for relief that there was insufficient evidence to

07  support a conviction for conspiracy to commit robbery because there was no evidence that

08  petitioner agreed or intended that Dorman, Bryant, or King should take property by force or

09  threatened use of force.

10       When evaluating a claim of insufficiency of the evidence, a reviewing court must consider

11  "whether, after viewing the evidence in the light most favorable to the prosecution, any rational

12  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

13  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The Supreme Court emphasized in *Jackson* that

14  constitutional sufficiency review is sharply limited and that the reviewing court owes great

15  deference to the trier of fact.  *Jackson*, 443 U.S. at 319.  Under the standard established in

16  *Jackson*,

> [A] federal habeas court faced with a record of historical facts that supports
> conflicting inferences must presume–even if it does not affirmatively appear in the
> record–that the trier of fact resolved any such conflicts in favor of the prosecution and
> must defer to that resolution.

20  *Jackson*, 443 U.S. at 326.

21       The Washington Court of Appeals, on direct review, rejected petitioner's sufficiency of

22  the evidence claim.  The Court of Appeals explained its conclusion as follows:

To prove the conspiracy charge, the State had to prove that Israel agreed with one or more persons to cause conduct constituting robbery in the first degree, that he made the agreement with the intent that such conduct be performed, and that a person involved in the agreement took a substantial step in pursuance of that agreement. RCW 9A.28.040.  A conspiracy may be proven by a "concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose."  *State v. Casarez-Gastelum*, 48 Wash.App. 112, 116, 738 P.2d 303 (1987) (quoting *Marino v. United States*, 91 F.2d 691, 694 (9th Cir. 1937)).  A formal agreement is not necessary, *State v. Smith*, 65 Wash.App. 468, 471 828 P.2d 654 (1992), and the conspiracy may be proved by circumstantial evidence.  *State v. Barnes*, 85 Wash.App. 638, 664, 932 P.2d 669 (1997); *State v. Brown*, 45 Wash.App. 571, 579, 726 P.2d 60 (1986).  Further, once a conspiracy has been established, "evidence of a defendant's slight connection to it ... is sufficient to convict him of participation in the conspiracy."  *Barnes*, 85 Wash.App. at 664, 932 P.2d 669.

Israel argues that the conspiracy charge must be dismissed because there was insufficient evidence that he agreed or intended that the crime of robbery in the first degree should occur.[6]  But the evidence, viewed in the light most favorable to the State, clearly supported Israel's conviction as a member of the conspiracy.  Dorman testified that he told Israel the jewelry he brought him came from robberies.[7]  Further, Dorman testified that Israel asked for "high-ticket" items, such as Rolex watches, many of which are likely to be found on another's person; in fact, Jerry Burtenshaw testified that his assailants took a Rolex watch from his wrist.  Dorman testified that Israel assured him that they could bring him such items without "mangling" them and

---

[6] [Court of Appeals' footnote 13] As charged against Israel, the elements of robbery in the first degree include: (1) the defendant or an accomplice took personal property from the person or in the presence of another with intent to commit theft; (2) the taking was against the person's will by the use or threatened use of force, violence, or fear of injury to that person or another; (3) the force or fear was used to obtain or retain possession of the property, and (4) the defendant or an accomplice was armed with a deadly weapon or displayed what appeared to be a deadly weapon.  RCW 9A.56.200(1).

[7] [Court of Appeals' footnote 14] Israel argues that Dorman's testimony was insufficient to establish Israel's knowledge of robberies.  Dorman did not clearly articulate how much he told Israel about the robberies.  At first, he simply stated, "He knows what we do."  When prompted further, Dorman seemed to use the terms "robbery" and "burglary" interchangeably.  Israel submits that this was insufficient to prove beyond a reasonable doubt that he knew the jewelry came from robberies.  But at least one permissible inference from Dorman's testimony was that Israel knew he and Bryant were taking property by force.  In light of all the evidence, the jury could reasonably conclude that Dorman told Israel enough to make him aware that he was committing robberies rather than thefts or burglaries.

REPORT AND RECOMMENDATION
PAGE -18

that "the police aren't going to find out about it."  Dorman also testified that when he brought Israel the jewelry, Israel told him that the other people in the PXC "had nothing to do with it and were not to have anything to do with it."  Further, Dorman testified that he and Bryant had been trying to get Israel to give them tips on better places to rob and that after he returned from California, Bryant told him that Israel finally had given them a "tip" on a very lucrative robbery.  This evidence, viewed in the light most favorable to the State, was sufficient to prove Israel had an agreement with Bryant that he and his cohorts would commit robberies and bring Israel the proceeds and that Israel intended that such robberies take place.  The agreement may not have been explicit or formal, but the evidence supports an understanding between the defendants, which is all the law requires.  *Smith*, 65 Wash.App. at 471, 828 P.2d 654.

In particular, the jury had substantial evidence from which it could conclude that Israel conspired with Bryant to commit the Burtenshaw robbery.  The Burtenshaw and Israel families were friends and neighbors, and the Burtenshaws attended Israel's wedding.  The Burtenshaw home is on a winding, hard-to-find road in an isolated location on Mercer Island.  The reader board that listed residents of the area did not list the Burtenshaws, and the jury saw a video tape of the road leading to the house.  They also heard evidence that Bryant and King lived in Everett - a city located approximately thirty miles from the Burtenshaw home in Mercer Island - whereas Israel grew up on Mercer Island and was familiar with the area.  The day before the Burtenshaw robbery, someone at PXC paged Bryant.  The State's theory was that Israel called Bryant to give him directions to the Burtenshaw house.  The next day someone at King's house called the Burtenshaw residence.  Also on the day after the robbery, Bryant brought the Burtenshaw jewelry to Israel to sell.  Dorman testified that when he returned from California in late December 1993, Bryant told him about a robbery he and King had done in which they had gotten a "good score and ... a lot of cash, jewelry....  They'd gotten a good tip from Israel and it paid off."  Dorman testified that this information was of interest to him because they had been trying to get Israel to give them information on more lucrative jobs.  Given this evidence, the jury could reasonably reject Israel's explanation of events - that Bryant overheard Israel talking about the Burtenshaws and found them on his own - and conclude instead that Israel provided directions to Bryant with the understanding that he would rob them.

Israel argues that even if the evidence was sufficient to show he conspired to commit robberies, there was no evidence that he intended or agreed that weapons would be used.  Accordingly, he argues that the evidence was insufficient to convict him of conspiracy to commit robbery in the first degree.  We disagree.  The above evidence allowed the jury to conclude that Israel, rather than being a mere "fence" for stolen jewelry, was deeply involved in the planning of the Burtenshaw robbery.  From this, the jury could infer Israel knew details of the plan including that Bryant would

REPORT AND RECOMMENDATION
PAGE -19

01   use weapons.  Further, although Dorman did not explicitly state that he and Bryant
     discussed the use of weapons with Israel, he testified that he told Israel "what we do."
02   Implied in this statement is that Israel knew the details of the robberies, including the
     use of weapons.  At least, that is one inference that the jury was entitled to draw from
03   the evidence presented.

04          Further, even if we assume that Israel did not know Bryant intended to rob the
     Burtenshaws with weapons, after the Burtenshaw robbery, Israel admittedly knew
05   that Bryant had committed that robbery with a weapon and in a violent manner.  The
     State's evidence indicated that Dorman and Bryant robbed at least four more houses
06   after the Burtenshaw robbery, and Israel admitted that he bought jewelry from
     Dorman on two occasions after the Burtenshaw robbery.  Assuming the truth of the
07   State's evidence,[8] the jury could reasonably see Israel's continued support of the
     violent robberies as a tacit agreement that Dorman and Bryant should continue
08   committing robberies in the same manner.  See Smith, 65 Wash.App. at 471, 828 P.2d
     654 (formal agreement not necessary).  Thus, even if Israel had not known enough
09   before the Burtenshaw robbery to make him guilty of the conspiracy charge, the jury
     was entitled to infer that Israel both agreed and intended that future first degree
10   robberies should occur once Israel knew the robbers' modus operandi and continued
     to encourage their activity.  The State's evidence was sufficient to prove beyond a
11   reasonable doubt that Israel was guilty of conspiracy to commit robbery in the first
     degree.

12

13   Israel, 113 Wash.App. at 285-287.

14          Petitioner argues here that the Court of Appeals unreasonably applied Jackson to the facts

15   of this case.  Petitioner faults the Court of Appeals for its reliance on Dorman's testimony and the

16   possible inferences which could be drawn from that testimony.  Petitioner concedes that Dorman's

17   testimony can be read to imply that he knew that he was receiving stolen property which could

18   _____

19          [8] [Court of Appeals' footnote 15] Although Israel claimed he did not know that Dorman
     engaged in robberies with Bryant, the jury was entitled to reject that testimony and adopt
20   Dorman's conflicting account.  Dorman testified that he and Bryant went to Israel together a
     number of times after previous robberies and that Dorman told Israel the jewelry came from
21   robberies.  Dorman's testimony also indicated that Israel's reason for refusing the jewelry from
     the Burtenshaw robbery was not that it was stolen, but because it was from that particular robbery
22   and was therefore too "hot."

REPORT AND RECOMMENDATION
PAGE -20

01  have come from burglaries and/or robberies.  He maintains, however, that there was no evidence

02  presented through Dorman, or any other witness, from which a reasonable trier of fact could have

03  concluded, beyond a reasonable doubt, that petitioner intended for his co-conspirators to use

04  deadly weapons to forcibly steal property from others.

05        Petitioner cites two cases in his traverse which reinforce the importance of proper

06  application of the standard announced in *Jackson*.  *See Goldyn v. Hayes*, 444 F.3d 1062 (9th Cir.

07  2006), and *Smith v. Mitchell*, 437 F.3d 884 (9th Cir. 2006).  However, these cases lend nothing

08  to this Court's analysis.  This Court's obligation is to review the state courts' decision in light of

09  clearly established federal law as determined by the United States Supreme Court.  This Court may

10  not substitute its judgment for that of the state courts.  Rather, this Court may only consider

11  whether the state courts' application of the relevant law was objectively reasonable.

12        In this case, of course, the applicable standard was set forth in *Jackson*.  The question this

13  Court must answer is whether that standard was reasonably applied to the facts of petitioner's

14  case.  Petitioner clearly believes that it was not.  However, this Court, having reviewed the

15  Washington Court of Appeals' decision in light of *Jackson,* concludes that the decision was

16  objectively reasonable.  Admittedly, there was no direct evidence that petitioner intended that his

17  co-conspirators would commit first degree robbery in order to obtain the property which he

18  purchased from them.  However, there was circumstantial evidence from which the jurors could

19  infer that petitioner had formed the requisite intent, if not before the Burtenshaw robbery, then

20  certainly after it.  Accordingly, petitioner's federal habeas petition should be denied with respect

21  to his second ground for relief.

22  / / /

REPORT AND RECOMMENDATION
PAGE -21

01

Ground Three:  Prosecutorial Misconduct

02      Petitioner asserts in his third ground for federal habeas relief that the prosecutor's

03 argument that petitioner was liable for the crimes of his co-conspirators which they committed

04 before petitioner joined them was misconduct which impermissibly reduced the State's burden of

05 proof in violation of the Due Process Clause.  The argument in question occurred during the

06 prosecutor's rebuttal closing argument.  The challenged comments were as follows:

07          The instructions tell you that once you become a part of a conspiracy, you
           adopt the prior actions of your co-conspirators.  That makes him a part of a
08          conspiracy to commit all of these robberies, every single one of them.

09 (Dkt. No. 25, Part F at 2193-2194.)

10      Petitioner asserts that this argument was legally incorrect because the *Pinkerton*[9] doctrine

11 does not make a co-conspirator strictly liable for all actions of his co-conspirators.  (Dkt. No. 1

12 at 39)  Instead, it requires proof of reasonable foreseeability before vicarious liability is imposed.

13 Petitioner also argues that the argument was incorrect because the prosecutor incorrectly told the

14 jury that *Pinkerton* liability was retroactive.  (*Id*.)

15      When a prosecutor's conduct is placed in question, the standard of review is the "narrow

16 one  of due  process, and not the broad exercise of supervisory power."          *Donnelly  v.*

17 *DeChristoforo*, 416 U.S. 637, 642 (1974).  This Court cannot issue a writ of habeas corpus to

18 state authorities unless the prosecutor's conduct "so infected the trial with unfairness as to make

19 the resulting conviction a denial of due process." *Id*. at 643; *Darden v. Wainwright*, 477 U.S. 168,

20 181 (1986).  In order to assess a claim that a prosecutor's comments constitute a due process

21

22          [9] *Pinkerton v. United States*, 328 U.S. 640 (1946).

REPORT AND RECOMMENDATION
PAGE -22

01 violation, it is necessary to examine the entire proceedings and place the prosecutor's statements

02 in context. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).

03    Petitioner raised this prosecutorial misconduct claim on direct review. However, the Court

04 of Appeals did not address the substance of the claim because it had already concluded that the

05 trial court erred in instructing the jury on *Pinkerton* liability and that the error was not harmless.

06 *See Israel*, 113 Wn. App. at 278 n.8. Any claim that the prosecutor committed misconduct in her

07 argument regarding the scope of *Pinkerton* liability would presumably have become moot once

08 the convictions which were affected by the erroneous instruction were reversed.

09    Petitioner does argue in these proceedings that the prosecutor's misstatement of the law

10 reduced the prosecution's burden of proof on the conspiracy and money laundering charges.

11 Petitioner fails, however, to elaborate on that assertion and to explain exactly how the

12 prosecutor's comments, even if legally incorrect, reduced the prosecutor's burden of proof with

13 respect to charges which were not obviously impacted by the *Pinkerton* instruction. Petitioner

14 fails to demonstrate that the prosecutor's erroneous comments resulted in a denial of his right to

15 due process. Accordingly, petitioner's federal habeas petition should be denied with respect to

16 his third ground for relief.

17                    Ground Four: Ineffective Assistance of Counsel

18    Petitioner asserts in his fourth ground for relief that his trial counsel's failure to object to

19 the prosecutor's argument that co-conspirators are retroactively liable for the prior crimes of their

20 conspirators constituted ineffective assistance of counsel.

21    The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

22 counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Claims of ineffective assistance

REPORT AND RECOMMENDATION
PAGE -23

01  of counsel are evaluated under the two-prong test set forth in *Strickland*. Under *Strickland*, a

02  defendant must prove (1) that counsel's performance fell below an objective standard of

03  reasonableness and, (2) that a reasonable probability exists that, but for counsel's error, the result

04  of the proceedings would have been different.

05      When considering the first prong of the *Strickland* test, judicial scrutiny must be highly

06  deferential.   *Strickland*, 466 U.S. at 689.   There is a strong presumption that counsel's

07  performance fell within the wide range of reasonably effective assistance.  *Id*.  The Ninth Circuit

08  has made clear that "[a] fair assessment of attorney performance requires that every effort be made

09  to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

10  challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

11  *Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689).

12      The second prong of the *Strickland* test requires a showing of actual prejudice related to

13  counsel's performance.   The petitioner must demonstrate that it is reasonably probable that, but

14  for counsel's errors, the result of the proceedings would have been different.  The reviewing Court

15  need not address both components of the inquiry if an insufficient showing is made on one

16  component.  *Strickland*, 466 U.S. at 697.  Furthermore, if both components are to be considered,

17  there is no prescribed order in which to address them.  *Id*.

18      Petitioner raised his ineffective assistance of counsel claim on direct appeal.  However, the

19  Court of Appeals determined that it need not address the defendants' argument that their attorneys

20  were ineffective for failing to object to the prosecutor's alleged misstatements about the scope of

21  *Pinkerton* liability because it had already concluded that the trial court erred in instructing the jury

22  on *Pinkerton* liability.  *Israel*, 113 Wn. App. at 278 n.8.

REPORT AND RECOMMENDATION
PAGE -24

01      Once again, petitioner fails to make clear how this claim remains viable given the Court

02   of Appeals resolution of the jury instruction claim which resulted in the reversal of his robbery and

03   kidnaping convictions.   Though petitioner once again suggests that the prosecutor's allegedly

04   improper argument had implications for his conspiracy and money laundering convictions as well,

05   he fails to make clear exactly how his counsel's failure to object to that argument prejudiced him

06   with respect to those convictions.   Accordingly, petitioner's federal habeas petitioner should be

07   denied with respect to petitioner's fourth ground for relief.

08                                   <u>CONCLUSION</u>

09      For the reasons set forth above, this Court recommends that petitioner's federal habeas

10   petition be denied and that this action be dismissed with prejudice.   A proposed order accompanies

11   this Report and Recommendation.

12      DATED this <u>17th</u> day of November, 2006.

13

14                                   Mary Alice Theiler
                                     United States Magistrate Judge

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -25